## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| MALCOM LEICHTER | : |
|     PLAINTIFF, | : |
| | :  CIVIL ACTION NO. 3:12cv342(VLB) |
| | : |
|     v. | :  JANUARY 9, 2013 |
| | : |
| LEBANON BOARD OF EDUCATION, ET AL, | : |
|     DEFENDANTS. | : |

## MEMORANDUM OF DECISION GRANTING IN PART AND DENYING IN PART DEFENDANTS' [DKT. #31] MOTION TO DISMISS

The Defendants, Lebanon Board of Education, (the "Board") and the Superintended of the Board, Janet Tyler ("Tyler"), have moved to dismiss the Plaintiff Malcom Leichter, Jr. ("Leichter")'s amended complaint pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim.  In the amended complaint, Plaintiff brings various causes of action in connection with his placement on administrative leave and then the elimination of his position as the Director of Business and Technology for the Lebanon Public School System, including violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §12101 et seq., violation of Section 504 of the Rehabilitation Act of  1973 ("Section 504"), 29 U.S.C. § 794, et seq., violation of his due process and equal protection rights under 42 U.S.C. §1983, as well as state law claims for breach of contract, breach of implied covenant of good faith and fair dealing, failure to pay wages in violation of Conn. Gen. Stat. §31-71a et seq., violation of the Connecticut Fair Employment Practices Act ("CFEPA"), Conn. Gen. Stat. §46a-51 et seq. and for

punitive damages.  For the foregoing reasons, the Court GRANTS IN PART AND DENIES IN PART Defendants' motion to dismiss.

## Procedural Background

On August 8, 2012, the Plaintiff amended his complaint.  *See* [Dkt. #29].  On August 29, 2012, the Defendants moved to dismiss the Plaintiff's *Monell* claim, due process claims, equal protection claim, ADA and Section 504 claims against Defendant Tyler, breach of contract claim, breach of implied covenant of good faith and fair dealing claim and claim for punitive damages against the Board. Defendants argued that the ADA and Section 504 claims against Defendant Tyler should be dismissed on the basis there is no individual liability under either statute.  *See* [Dkt. #32, p. 15].  Recognizing their impropriety, the Plaintiff consented to the withdrawal of those claims against Tyler.  [Dkt. #37, p.21].  The Court therefore dismisses the ADA and Section 504 claims against Tyler.  In addition, Defendants moved to dismiss the Plaintiff's equal protection claim on the basis that disability is not a protected class.  *See* [Dkt. #32, p. 15].  Plaintiff also consented to the withdrawal of that claim in his response as well.  [Dkt. #37, p.21].  The Court therefore dismisses the Plaintiff's equal protection claim.

After Plaintiff responded to the motion to dismiss, the Plaintiff moved to withdraw his claim for intentional infliction of emotional distress and all claims in any counts of the amended complaint for damages for emotional distress, which the Court granted.  [Dkt. ##40-41].  Consequently, arguments relating to the withdrawn intentional infliction of emotional distress claim are moot.

<u>Factual Allegations</u>

On October 25, 1996, the Plaintiff and the Board executed an employment agreement whereby the Plaintiff was hired as of November 4, 1996 as the Director of Business and Technology for the Lebanon Public Schools. [Dkt. #29, Amended Compl., ¶13]. On June 26, 1997, the Plaintiff and the Board executed a second employment agreement which modified some terms which are not relevant to the issues in the present case. *Id.* at ¶14.

 The agreement provides in relevant part:

**Section I: Continuation of Contract and Salary Agreement**
**This contract shall be renewed annually. For each year for which this contract is renewed, the annual salary of the Director of Business & Technology shall be established by mutual agreement between the Director of Business & Technology and the Board.**

**Section II: Continuation of Contract and Salary Agreement**
**The contract may be terminated at any time by mutual consent of the parties. It may also be terminated by the Board for cause. The Director of Business & Technology may resign or retire by submitting at least thirty (30) days written notice to the Board.**
 **[Dkt. # 29, Ex. E, Second Employment Agreement, p.1].**

Prior to working for the Board, the Plaintiff was employed as an information systems services manager at Internal Business Machines ("IBM"). [Dkt. #29, Amended Compl., ¶16]. Plaintiff continued to be employed under the agreement as the Director of Business and Technology until January 28, 2011 and was earning $102, 229 per year in his position at the time of his termination. *Id.* at ¶20.

Superintendent Tyler began working for the Board on or about July 26, 2010. *Id.* at ¶21. Plaintiff alleges that he "never had any issues with the prior

three superintendents to whom he reported and all of Plaintiff's job performance evaluations were positive." *Id.*   Plaintiff further alleges that from the beginning of her tenure, Tyler "expressed displeasure with the Plaintiff due to his disabilities which required him to miss time at work for surgery and cardiac rehabilitation." *Id.* at ¶22.   Plaintiff suffered from heart attacks and had a cardiac catheterization on July 27, 2010 and a second catheterization on August 11, 2010.  *Id.* at ¶23.  Plaintiff returned to work full time on August 23, 2012 with a restriction that he could not work past six at night.  *Id.* at ¶24.

On September 23, 2010, Plaintiff began a cardiac rehabilitation program which ran three times a week for twelve weeks.  *Id.* at ¶25.  Plaintiff alleges that Tyler made "many derogatory and hurtful remarks about Plaintiff not being in the office due to his cardiologist ordered cardiac rehabilitation, and the restrictions placed upon him regarding the length of his work day by his cardiologist." *Id.*  He completed the rehabilitation program on December 22, 2010.  *Id.* at ¶26.  In December 2010, Tyler ordered Plaintiff to get a full release back to work because he was still limited to working no later than six at night.  *Id.* at ¶27.   His cardiologist insisted that he could work no later than six and "Tyler continued to express displeasure with Plaintiff's inability to work as late in the evening as she wanted him to." *Id.*   Plaintiff alleges that Tyler was "rude, sarcastic, demeaning, controlling and manipulative to the Plaintiff due to his disability and inability to work as many hours as she had demanded." *Id.* at ¶28.

On January 4, 2011, Plaintiff experienced chest pains and was instructed to not return to work on January 10, 2011.  *Id.* at ¶29.   Plaintiff returned to work on

January 10, 2011 and "Tyler continued to harass and demean Plaintiff due to Plaintiff's disability and his need to leave work by six each night." *Id.* at ¶30.

On January 28, 2011, Plaintiff alleges he was called into Tyler's office where he was "suspended without cause (purportedly placed on 'administrative leave') by Tyler." *Id.* at ¶31.   Plaintiff alleges he was told by Tyler that the suspension "was not disciplinary, nor was Plaintiff being fired or laid off, but was necessary so that Tyler could review the operations of the business office." *Id.* Tyler allegedly stated that "she was looking for 'efficiencies' and that Plaintiff should look at the suspension … as a 'mini-vacation.'" *Id.*   Plaintiff was required to "turn in his keys, and was escorted from the building by a burly (physically imposing) staff member … in the presence of two state troopers." *Id.*  Plaintiff also alleges he was told to "stay away from the premises and to have no contact with any employees of the Lebanon Public School." *Id.*

On January 18, 2011, Tyler sent an email regarding Plaintiff's suspension to "all staff of the Lebanon Public Schools." *Id.*  at ¶32.  Plaintiff alleges that the email led staff members "to believe that the Plaintiff had done something morally, and/or ethically, and /or criminally wrong." *Id.*   In the email, Tyler wrote

> This communication is to inform district staff that Mal Leichter, the Director of Business and Technology, has been placed on administrative leave while district operations are reviewed.  Mr. Leichter will not be taking any action on behalf of the school district while he is on leave, nor is he to have any contact with district employees.  Should you receive communications from Mr. Leichter, please forward that information to my office.  Additional information will be forthcoming concerning responsibilities and reporting in Mr. Leichter's absence for affected employees.  In the meantime, please contact me directly should you have any question.

[Dkt. #29, Ex. F].

On February 1, 2011, five days after Plaintiff was suspended, Tyler completed her review of the operations of the business office and her search for efficiencies without any input from the Plaintiff. Dkt. #29, Amended Compl., ¶34]. Tyler decided to divide the Plaintiff's position into two positions; a business manager position and a technology manager position. *Id.* On February 16, 2011, the Board hired an outside contractor at an annualized cost of $124,800 per year to perform a part of the technology portion of Plaintiff's position. *Id.* at ¶35. On March 1, 2011, the Board hired a temporary part time business manager to perform the business management portion of Plaintiff's position. *Id.* at ¶36.

On March 15, 2011, the Board contracted an outside accounting firm, Kostin and Ruffkess & Company, LLC ("Kostin") to conduct a review of the operations of the school business. *Id.* at ¶32. Plaintiff alleges that upon information and belief, Kostin was contracted to "find accounting irregularities, and/or illegal transactions, and/or fraud allegedly perpetrated by the Plaintiff." *Id.* at ¶37. Plaintiff alleges that Kostin "was directed to audit transaction that by their nature tend to be higher risk such as credit card transactions, payments to individuals, payments to banks." *Id.* Plaintiff further alleges that no evidence of accounting irregularities, illegal transaction or fraud was found. *Id.*

On April 1, 2011, the Board hired an outside contractor for $25,000 to complete a project closeout and report that was formerly Plaintiff's responsibility. *Id.* at ¶39. On April 5, 2011, Tyler formally proposed to the Board that they divide the Plaintiff's position into two positions to redistribute the responsibilities. *Id.* On April 8, 2011, Plaintiff alleges that Tyler was quoted in an article in the

Willimantic Chronicle newspaper stating that the Plaintiff's job "is bigger than one person can handle."  *Id.* at ¶40.

On April 26, 2011, the Board followed Tyler's recommendation and voted to eliminate Plaintiff's position and split the duties into two positions.  *Id.* at ¶41. Plaintiff alleges that he was not offered either position, "despite being highly qualified for both positions."  *Id.*  On May 4, 2011, Plaintiff received a letter stating that his position no longer existed and informing him that the Board would honor his contract through June 30, 2011.  *Id.* at ¶42.On June 29, 2011, the Board hired a new Director of Technology at an annual salary of $78,900.  *Id.* at ¶43.  On September 1, 2011, the Board hired a part time consultant to perform the business manager portion of the Plaintiff's position.  *Id.* at ¶44.

Plaintiff alleges that the "Board has a practice and/or policy of discriminating against individuals with disabilities.  Tyler has a history of discrimination against persons with disabilities.  The Board has dismissed five employees with physical impairments since June 1, 2010 ."  *Id.* at ¶47.  Plaintiff further alleges that the Board and Tyler are the policy makers for the Town of Lebanon Public Schools and that Tyler as Superintendent acts as the Chief Executive Officer of the schools.   He further alleges that Tyler has authority to hire, fire, discipline and set policy.  *Id.* at ¶48.

The Plaintiff alleges that he was denied due process in several different ways.  He alleges that he had a protected property interest in his employment and was denied due process when he was suspended without a hearing.  *Id.* at p. 22.

He also alleges that he was denied due process when the Board terminated his employment without a hearing.  *Id.*

The Plaintiff also alleges that he had a protected liberty interest in his employment with the Board and that the Defendants "created and disseminated a false and defamatory impression about the Plaintiff in connection with his suspension and/or termination of his employment."  *Id.* at p.23.   Plaintiff further alleges that the Defendants sent a defamatory email to Board employees and engaged Kostin to perform an audit without providing Plaintiff a hearing to clear his good name.  *Id.*

Plaintiff claims that the Defendants breached his contract when they terminated his employment without cause.  *Id.* at p.25.   He also asserts that the Defendants breached the covenant of good faith and fair dealing when he was terminated due to his disability "in violation of public policy."  *Id.* at p.26.

## Legal Standard

"'To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *Sarmiento v. U.S.*, 678 F.3d 147 (2d Cir. 2012)(quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  While Rule 8 does not require detailed factual allegations, "[a] pleading that offers 'labels and conclusions' or 'formulaic recitation of the elements of a cause of action will not do.' Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal*, 556 U.S. at 678 (citations and internal quotations omitted).  "Where a complaint

pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.' " *Id.* (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 557 (2007)).  A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (internal citations omitted).

In considering a motion to dismiss for failure to state a claim, the Court should follow a "two-pronged approach" to evaluate the sufficiency of the complaint. *Hayden v. Paterson*, 594 F.3d 150, 161 (2d Cir. 2010).  "A court 'can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth.'" *Id.* (quoting *Iqbal*, 129 S.Ct. at 1949-50).  "At the second step, a court should determine whether the 'well-pleaded factual allegations,' assumed to be true, 'plausibly give rise to an entitlement to relief.'" *Id.* (quoting *Iqbal*, 556 U.S. 679).  "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (internal quotations omitted).

<u>Analysis</u>

i.    **Breach of Contract Claim**

Defendants argues there is no breach of the employment agreement because the agreement was "renewable annually and was not renewed when it expired in June 2011."  [Dkt. #32, Mem., p. 20].  The Defendants further argue that

the "for cause" provision expressly relates to termination not to non-renewals. Plaintiff contends that the renewal provision was mandatory and argues that the Board had no discretion to decline to renew the agreement.  [Dkt. #37, Mem., p.25-26].  In response to Plaintiff's argument, Defendants contend that if the agreement was for an indefinite duration, the employment relationship must necessarily be at-will in line with state law precedent which provides that  "[a]s a general rule, contracts of permanent employment, or for an indefinite term, are terminable at will." *D'Ulisse-Cupo v. Board of Directors of Notre Dame High School,* 202 Conn. 206, 211 n. 1, (1987).  [Dkt. #32, Mem., p. 20].  Defendants also suggest that the contract cannot be interpreted to renew automatically because the Board had no power to execute a contract for indefinite duration pursuant to the reasoning of *Solomon v. Hall-Brooke Found.,* Inc. 30 Conn.App. 129 (1993). [Dkt. #42, Mem., p. 8].  Lastly, Defendants argue that they had cause to terminate the employment relationship based on the elimination of Plaintiff's position.  [Dkt. #32, Mem., p. 20-21].

"Although ordinarily the question of contract interpretation, being a question of the parties' intent, is a question of fact ... [w]here there is definitive contract language, the determination of what the parties intended by their contractual communications is a question of law .... subject to plenary review by this court."  *Schwartz v. Family Dental Group, P.C.,* 106 Conn.App. 765, 771 (2008) (internal quotation marks and citation omitted). "In giving meaning to the terms of a contract, the court should construe the agreement as a whole, and its relevant provisions are to be considered together.... The contract must be construed to

give effect to the intent of the contracting parties.... This intent must be determined from the language of the instrument and not from any intention either of the parties may have secretly entertained.... [I]ntent ... is to be ascertained by a fair and reasonable construction of the written words and ... the language used must be accorded its common, natural, and ordinary meaning and usage where it can be sensibly applied to the subject matter of the contract." *Phillips v. Phillips*, 101 Conn.App. 65, 74 (2007) (internal quotation marks and citation omitted). "[Where] ... there is clear and definitive contract language, the scope and meaning of that language is not a question of fact but a question of law.  When the language is clear and unambiguous, however, the contract is to be given effect according to its terms.... In such a case, no room exists for construction" *Schwartz*, 106 Conn.App. at  771 (internal quotation marks and citation omitted). "When there is ambiguity, [the court] must construe contractual terms against the drafter." *Cameron v. Avonridge, Inc.,* 3 Conn.App. 230, 233 (1985) (Internal quotation marks and citation omitted.).

In the present case, this Court finds that the renewal provision of the employment agreement unambiguously provides for automatic renewal of the agreement.  The language of the renewal provision provides that the "contract *shall* be renewed annually."  [Dkt. # 29, Ex. E, Second Employment Agreement, p.1] (emphasis added).  The use of the term "shall" instead of "may" indicates that renewal was non-discretionary.  The Connecticut Supreme Court has recognized that the "use of the word 'shall' denotes that [a] directive in the contract … was mandatory."  *A. Dubreuil and Sons, Inc. v. Town of Lisbon*, 215

11

Conn. 604, 610-11 (1990).   The Connecticut Supreme Court explained that the "word 'may,' unless the context in which it is employed requires otherwise, is not normally used as a word of command… The term 'may' generally imports permissive conduct and the use of discretion."  *Id.*; *see also Indymac Mortgage Holdings, Inc. v. Reyad*, 167 F.Supp.2d 222, 245 (D. Conn. 2001) (noting that the "word 'shall' is a mandatory term"); Black's Law Dictionary (9th Ed.)(Defining shall as "has a duty; more broadly, is required to").  When reading the renewal provision in conjunction with the termination provision, a fair and reasonable construction of the written words indicates that the agreement renews automatically on an annual basis and that the only means available to the Board to unilaterally end the agreement is termination for cause.  The Defendants' arguments that there was no breach because the Board declined to renew the agreement are therefore without merit in light of the clear meaning of the terms of the agreement.

Defendant next argues that if the agreement automatically renews it is a contract for an indefinite term and therefore creates an at-will employment relationship terminable for any reason.  "In Connecticut, an employer and employee have an at-will employment relationship in the absence of a contract to the contrary."  *Thibodeau v. Design Group One Architects, LLC,* 260 Conn. 691, 697–98 (2002).  "As a general rule, contracts of permanent employment, or for an indefinite term, are terminable at will."  *D'Ulisse-Cupo v. Board of Directors of Notre Dame High School,* 202 Conn. 206, 211 n. 1 (1987).  "Parties must specifically contract for a right to be terminated only for cause."  *Cruz v. Visual*

*Perceptions, LLC*, 136 Conn.App. 330, 338 (2012).  Therefore, "pursuant to traditional contract principles, however, the default rule of employment at-will can be modified by the agreement of the parties."  *Torosyan v. Boehringer Ingelheim Pharmaceuticals, Inc.*, 234 Conn. 1, 15 (1995).   Here, Defendants' argument is premised on the default rule that contracts for indefinite employment are terminable at will.   However, it is axiomatic that parties can contract out of the default rule and modify the agreement to provide a right to be terminated only for cause.   Here, the clear terms of the agreement indicate that the parties have done so as they have expressly contracted for a right to termination only for cause. As the parties have clearly contracted out of the default rule, this Court's interpretation that the agreement is for an indefinite period of time terminable only for cause is clearly not at odds with either the contractual language or legal precedent as Defendants contend.

Defendants next suggest that the Board did not have any authority to execute a contract of indefinite duration relying on the rationale of *Solomon v. Hall-Brooke Found.*, Inc. 30 Conn.App. 129 (1993).   In *Solomon*, a donor who created a charitable foundation brought an action to rescind her gift and for breach of contract after the foundation terminated her employment as executive director.  The *Solomon* court concluded that the employment contract which called for continued employment until age 65 or retirement and which permitted the defendant to fire her only if she were adjudicated in a criminal court of competent jurisdiction to be guilty of theft, fraud or embezzlement regarding the defendant's assets was unenforceable as a matter of public policy.  *Id.* at 135.

The *Solomon* court based its reasoning on a Connecticut Supreme Court case that held "'[t]here is some authority for the proposition that directors have no power to hire an employee on a lifetime basis ... Such cases are generally based on the theory that a board of directors, in selecting the management personnel of the corporation, should not be allowed to hamstring future boards in the overall supervision of the enterprise and the implementation of changing corporate policy.'" *Id.* at 135 n.5 (quoting *Osborne v. Locke Steel Chain Co.,* 153 Conn. 527, 537, 218 A.2d 526 (1966)).   The Defendants argue that the Board of Education has similar management rights as corporate boards in *Solomon* citing to Conn. Gen. Stat. §10-220.  [Dkt. #42, Mem., p. 9].  The Defendants suggest that the *Solomon* court's rationale counsels against interpreting the renewal provision as automatic thereby resulting in lifetime employment.  *Id.*

        As Plaintiff points out the facts of Solomon are distinguishable.  In *Solomon*, termination was only permissible if the director was adjudicated in a criminal court of competent jurisdiction to be guilty of theft, fraud or embezzlement regarding the foundation's assets.   This restriction on termination was far more narrow and restrictive than a common place restriction on termination for cause.   The ability to terminate for cause does not truly render an indefinite employment contract into a contract for guaranteed lifetime employment as was the case in *Solomon* in which termination was extremely limited.  In addition, the *Solomon* court's reasoning that the contract violated public policy was predicated on the law of corporations.  Although Defendants attempt to draw a parallel between a Board of Education and a corporate board,

the Court is not persuaded that such a parallel is appropriate.   It is well established and common place for a board of education to employ individuals on a "lifetime basis" through teacher tenure.   Further Connecticut courts have held that pursuant to Conn. Gen. Stat. §§10-151 and 10-220 "[w]ide discretion is customarily vested in school boards with regard to employment of teachers, and courts should not interfere as long as that discretion is exercised in good faith … When that discretion is exercised in good faith, the courts should not interfere." *Harhay v. Board of Educ. of the Town of Ellington*, 44 Conn. App. 179, 187 (1997) (citing *Conley v. Board of Educ.*, 143 Conn. 488, 495 (1965)).  Although the Plaintiff was not a teacher, this Court sees no reason why these provisions don't similarly vest the board of education with wide discretion with regard to employment of all school personnel.  Clearly a board of education, in selecting tenured employees, has the ability to hamstring future boards in the overall supervision of the school system unlike the case of a corporate board in *Solomon*.  Consequently, the rationale in *Solomon* does not counsel against interpreting the contract as automatically renewing terminable only for cause. This conclusion is buttressed by the fact that the "for cause" termination provision did not hamstring future boards, as it gave future boards the authority to exercise reasonable discretion to terminate the Plaintiff.

Lastly, Defendants argue there was cause to terminate because the Plaintiff's position was admittedly eliminated.  However, Plaintiff has alleged that the elimination of his position was a pretext for termination on the basis of disability and therefore without cause.   The allegations in the complaint plausibly

15

state that Tyler was animated by anti-disability animus and that the elimination of his position was merely a pretext to terminate him on the basis of his disability. The Plaintiff has therefore plausibly stated that he was terminated without cause at the motion to dismiss stage. *See Gardner v. St. Paul Catholic High School, Inc.*, No.CV970143514, 2001 WL 1517042, at *3-4 (Conn. Super. Ct. Nov. 15, 2001) (holding that there was a question of fact as to whether the defendant school's decision to terminate teacher's employment did not constitute good or sufficient cause as it was contrived and not the true reason for eliminating the teacher's position). The question of whether the elimination of Plaintiff's position was good cause for his termination or a pretext is a question of fact to be determined on either summary judgment or trial. The Court therefore denies Defendants' motion to dismiss the Plaintiff's breach of contract claim.

ii.    Due Process Claim

The Defendants argue that the Plaintiff has no protectable property interest in his job because he has not alleged that he has a right to be fired without just cause. As discussed above, this Court has found that the employment agreement did not establish an at-will employment relationship but provided only a right to terminate for cause. "In the employment context, a property interest arises only where the state is barred, whether by statute or contract, from terminating (or not renewing) the employment relationship *without cause*." *Taravella v. Town of Wolcott*, 599 F.3d 129, 134 (2d Cir. 2010) (internal quotation marks and citations omitted) (emphasis in the original). A "property interest in employment may be the subject of a due process claim only if the plaintiff has a

16

legitimate claim of entitlement to it." *Etere v. City of New York*, 381 F. App'x. 24, 25 (2d Cir. 2010) (internal quotation marks and citation omitted).  Here, the Plaintiff clearly has a protected property interest because the Board is barred by contract from terminating the employment relationship without cause.

The Defendants contend that even if the Plaintiff has a protectable property interest there would be no due process violation because the Defendant afforded the Plaintiff due process to which he did not avail himself.  Defendants point out that Plaintiff failed to utilize the procedures established by the Board's policy regarding resolution of problems or complaints for non-unionized personnel.  See [Dkt. #32, Mem., p.12-13].  That due process policy provides that an employee who contests an employment action must first discuss the problem or complaint with his or her supervisor then if necessary the superintendent.  [Dkt. #32, Mem., p. 18].  Then, if the employee is not satisfied with the disposition of the problem or complaint, the employee may submit a written statement to his supervisor within five days.  The supervisor shall render a written decision and reason therefore to the employee and superintendent within five days.  If the employee is still not satisfied, the employee may submit an appeal to the superintendent within five days of receipt of prior disposition.  The superintendent shall render a written decision and reason therefore to the employee within ten days.   If the employee is still not satisfied, the employee may submit an appeal to the Board within five days of receipt of prior disposition.  *Id.*  As Defendants highlight, "[c]ourts have held that [] post-deprivation procedures [such as grievance and arbitration procedures pursuant to a collective bargaining agreement], providing

17

for a hearing to contest a challenged employment decision, are sufficient to satisfy due process."  *Harhay v. Town of Ellington Bd. of Educ.*, 323 F.3d 206, 213 (2d Cir. 2003).

Plaintiff argues that the policy was not applicable to his situation, that the policy did not provide for a pre-termination hearing which due process requires, and that once he was terminated he was no longer an employee with recourse to the procedures laid out in the policy.  Plaintiff also argues that any appeal would be futile.  Although it does appear that Plaintiff could have utilized the procedures under the policy to dispute Tyler's decision to place him on administrative leave but not to dispute his termination once he was no longer an employee, the existence of the policy and the Plaintiff's failure to utilize the procedures are matters that go beyond the allegations in the amended complaint and may not be considered by this Court at the motion to dismiss stage.  *See Green v. McLaughlin*, 480 F. App'x 44, 49 (2d Cir. 2012) ("[W]hen matters outside the pleadings are presented in response to a 12(b)(6) motion, a district court must either exclude the additional material and decide the motion on the complaint alone *or* convert the motion to one for summary judgment under Fed.R.Civ.P. 56 and afford all parties the opportunity to present supporting material.") (internal quotation marks and citations omitted).  On the basis of the allegations of the amended complaint, the Plaintiff has plausibly stated that he has a protectable property interest in his continued employment and that due process was violated when he was denied a hearing in connection with either his suspension or termination.   The parties will have the opportunity to raise the issue of whether

18

these procedures were sufficient to satisfy due process and whether due process was violated when Plaintiff failed to pursue these procedures on summary judgment or trial.[1]   The Court therefore denies Defendants' motion to dismiss Plaintiff's due process claim.

      iii.    **Stigma-Plus Claim**

Plaintiff argues that he has plausibly pled a stigma-plus due process claim on the basis of Tyler's allegedly defaming email, his removal from the Board's property by a staff member in the presence of state troopers, the engagement by the Board of auditors, and Tyler's recommendation to the Board to eliminate the Plaintiff's position to create two new positions.   It is well established that a "person's interest in his or her good reputation alone, apart from a more tangible interest, is not a liberty or property interest sufficient to invoke the procedural protections of the Due Process Clause or create a cause of action under § 1983." *Patterson v. City of Utica,* 370 F.3d 322, 329–30 (2d Cir.2004).  However, "Loss of one's reputation can, however, invoke the protections of the Due Process Clause if that loss is coupled with the deprivation of a more tangible interest."  *Id.* at 330.

 "'In an action based on a termination from government employment, a plaintiff must satisfy three elements in order to demonstrate a deprivation of the stigma component of a stigma-plus claim.'"  *Holmes v. Town of East Lyme*, 866

---

[1] **Further factual development as to how this policy worked in practice must be conducted for the Court to determine on summary judgment or at trial whether the procedures afforded under the policy satisfied the requirements of due process irrespective of whether the Plaintiff failed to utilize those procedures or not.**

F.Supp.2d 108, 125 (D. Conn. 2012) (quoting *Segal v. City of New York,* 459 F.3d 207, 212 (2d Cir.2006)).   "First, the plaintiff must ... show that the government made stigmatizing statements about [him]—statements that call into question [the] plaintiff's good name, reputation, honor, or integrity.  We have also said that statements that denigrate the employee's competence as a professional and impugn the employee's professional reputation in such a fashion as to effectively put a significant roadblock in that employee's continued ability to practice his or her profession will satisfy the stigma requirement.  Second, a plaintiff must prove these stigmatizing statements were made public. Third, the plaintiff must show that the stigmatizing statements were made concurrently with, or in close temporal relationship to, the plaintiff's dismissal from government employment." *Id.* (internal quotation marks and citations omitted).  "A plaintiff generally is required only to raise the falsity of these stigmatizing statements as an issue, not prove they are false." *Patterson*, 370 F.3d at 330.

As Defendants argue, the Plaintiff fails to plausibly allege that the Defendants made stigmatizing statements about him which called into question his good name, reputation, honor, or integrity as no accusations were leveled against him and he was not terminated until the district determined and announced that his job was too demanding to be performed well by a single person.  The only statements to which the Plaintiff points are Tyler's email informing staff that the Plaintiff was placed on administrative leave while district operations were reviewed and instructing staff to refrain from communicating with the Plaintiff while he was on leave.   These statements are not the type of

false reputation-tarnishing statements sufficient to support a stigma-plus due process claim. The fact that an innocuous statement may be lead to unwarranted speculation does not make the statement stigmatizing.  That is particularly true where, as here, any potential stigma was dissolved by a later statement in close proximity to the statement in question.  "Courts have consistently held that statements announcing personnel decisions, even when leaked to the press, and even when a reader might infer something unfavorable about the employee, are not actionable." *Wise v. Kelley*, no.08-cv-6348, 2009 WL 2902513, at *4 (S.D.N.Y. Sept. 10, 2009) (collecting authority).  In addition, courts have held that "true public statements that a party is under investigation" are not stigmatizing.  *Id.* at 5 (collecting authority).  Moreover, the Plaintiff has not plausibly raised the falsity of these statements as; indeed the Plaintiff was placed on administrative leave to facilitate an independent review and Plaintiff does not contend that a review was conducted.  Therefore, Tyler's statement did not contain any facts capable of being proven false in order to plausibly state an entitlement to relief.

Likewise, the Board's action in suspending then terminating the Plaintiff, escorting the Plaintiff off of Board property, and eliminating his position cannot support a stigma-plus claim for similar reasons.   The Second Circuit has explained that where the alleged stigma arises from the employer's actions and not its statements, a plaintiff has alleged only "the plus without the stigma" and that the plus alone is insufficient to create the stigma.  *O'Connor v. Pierson*, 426 F.3d 187, 195 (2d Cir. 2005).  In *O'Connor*, the Second circuit concluded that a public teacher's suspension by the board of education even if "townsfolk drew

negative inferences from his suspension," was not sufficient to make out a stigma-plus claim.  Here, Board's actions towards the Plaintiff are insufficient allegations of plus without stigma.

Plaintiff argues in sum that the Board and Tyler's conduct was tantamount to a subtle public campaign which imposed an actionable stigma in line with the Second Circuit's decision in *Quinn v. Syracuse Model Neigh. Corp.*, 613 F.2d 438, 447 (2d Cir. 1980).  In *Quinn*, the Second Circuit explained that a "subtle campaign designed by city officials to make plaintiff the scapegoat for an episode of municipal misfeasance may impose no less an indelible stigma than a public proclamation announced at high noon from the steps of City Hall."  *Id.* at 447.  The defendant in *Quinn* "began a publicity campaign designed to coerce the SMNC Board to fire Quinn.  A series of articles appeared in the local Syracuse press suggesting that Quinn was responsible for the missing funds."  *Id.* at 444.  However, the facts of Quinn are inapposite to the facts of the present case.   The Plaintiff has not alleged that the Board undertook anything resembling the type of publicity campaign accusing the plaintiff of criminal activity as was the case in *Quinn*.  See *Grunberg v. Board of Educ. For the City School Dist. Of the City of New York*, no.cv-00-4124(DGT), 2006 WL 845389, at *8 (E.D.N.Y. Mar. 30, 2006) (noting that in *Quinn*, the "defendants, through the media, made explicit accusations that the plaintiff engaged in criminal activities.").  In the present case, the Defendants made no statements to anyone, much less the media that the Plaintiff engaged in criminal or unethical conduct.

The Plaintiff's allegations do not amount to the type of widespread public smear campaign that was at issue in *Quinn* needed to make out a stigma-plus claim.   The Court therefore grants the Defendants' motion to dismiss the Plaintiff's stigma-plus due process claim.

    iv.    ***Monell*** **Claim. .**

In *Monell v. New York City Dept. of Social Servs.*, 436 U.S. 658 (1978), the Supreme Court held that municipalities cannot be held liable for constitutional torts under 42 U.S.C. §1983 on a *respondeat superior* theory but could be liable where execution of a municipality's policy or custom inflicts the injury.   Because the Plaintiff has consented to withdrawing his equal protection claim and the Court has dismissed the Plaintiff's stigma-plus claim, the sole remaining Section 1983 claim is the Plaintiff's claim that he was denied due process when he was suspended and terminated without notice or hearing.   The complaint is entirely devoid of any allegations that the Board had a custom, policy, or practice of terminating employees without providing pre-termination notice or a hearing. Plaintiff only alleges that the Board has a practice and policy of discriminating against individuals with disabilities.   As Plaintiff fails to allege any policy or custom that resulted in his due process injury, he has failed to plausibly state a claim for municipal liability under *Monell* to maintain his Section 1983 claim against the Board and against Tyler in her official capacity.   The Court therefore dismisses Plaintiff's due process claim against the Board and Tyler in her official capacity.   The claim shall remain extant against Tyler in her individual capacity.

v.    **Qualified Immunity**

Defendants argue that Tyler is entitled to the protections of qualified immunity on Plaintiff's Section 1983 claims.   When reviewing a claim of qualified immunity, a court must consider "whether the facts that the plaintiff has alleged (See Fed. Rules Civ. Porc. 12 (b)(b)(6), (c)) or shown (see Rule 50, 56) make out a violation of a constitutional [or statutory] right," and "whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct." *Pearson v. Callahan*, 555 U.S. 223, 232 (2009).

Although previously the Supreme Court prescribed a mandatory two-step analysis, considering first the constitutional violation prong and then the clearly established prong, the Court has since recognized that this rigid procedure "sometimes results in a substantial expenditure of scarce judicial resources on difficult questions that have no effect on the outcome of the case," as "[t]here are cases in which it is plain that a constitutional right is not established but far from obvious whether in fact there is a constitutional right." *Pearson*, 555 U.S. at 236-37. Thus, the Supreme Court has provided district courts with the discretion to decide the order in which the two prongs of the qualified immunity analysis are applied.  *Id.* at 243.  In providing the lower courts with the discretion to determine the order of qualified immunity analysis to be applied to a given case, the Supreme Court explicitly acknowledged that "there will be cases in which a court will rather quickly and easily decide that there was no violation of clearly established law before turning to the more difficult question of whether the relevant facts make out a constitutional question at all." *Id.* at 239.

Qualified immunity "protects government officials from liability where the officials' conduct was not in violation of a 'clearly established' constitutional right." *Sudler v. City of New York*, 11-1198-cv (L), 11-1216-cv (con), 2012 WL 3186373, at *10 (2d Cir. Aug. 7, 2012). "If the conduct did not violate a clearly established constitutional right, or if it was objectively reasonable for the [official] to believe that his conduct did not violate such a right, then the [official] is protected by qualified immunity." *Id.* (quoting *Doninger v. Niehoff*, 642 F.3d 334, 345 (2d Cir. 2011)). "Qualified immunity thus shields government officials from liability when they make 'reasonable mistakes' about the legality of their actions, and 'applies regardless of whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Id.* (internal citations omitted) (quoting *Pearson*, 555 U.S. at 231).

As the Court has dismissed Plaintiff's stigma-plus claim and the Plaintiff has withdrawn his equal protection claim, the Court will only consider whether qualified immunity applies with respect to Plaintiff's remaining Section 1983 due process claim.  Defendants argue that Tyler is entitled to qualified immunity because the Plaintiff's alleged property interest in his employment was not clearly established and because Tyler's interpretation of the employment agreement was objectively reasonable relying on the Second Circuit's rationale in *Taravella* and *Coollick v. Hughes*.

It is clearly established that a protectable property interest arises "'where the state is barred, whether by statute or contract, from terminating (or not renewing) the employment relationship *without cause.*'"  *Taravella*, 599 F.3d at

134 (quoting S&*D Maintenance Co. v. Goldin*, 844 F.2d 962, 967 (2d Cir. 1988)).  "It is also clear that the alleged property interest is constitutionally protected. [T]he state-law property interest of government employees who may only be discharged for cause ... is a constitutionally protected property interest for purposes of the Fourteenth Amendment … As such, [t]he tenured public employee is entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story."  *Id.* (internal quotation marks and citations omitted).

In *Taravella*, the Second Circuit concluded that an employer who terminated an employee without affording a pre-termination hearing was protected by qualified immunity because the employment agreement was ambiguous as a matter of law and the employer did not know about an alleged oral promise to provide union-like benefits including a pre-termination hearing. *Id.* at 135.  Despite Defendants' contrary contention, the employment agreement at issue in the present case is not ambiguous but clearly provides that Plaintiff could not be terminated without cause and therefore it created a property interest protected by due process.   Because the agreement was clear and unambiguous, Tyler's action could not be objectively reasonable as a matter of law as was the case in *Taravella*.

In *Coollick*, the Second Circuit concluded that a superintendent was entitled to qualified immunity in connection with the elimination of a guidance counselor's position. *Coollick v.* Hughes, 699 F.3d 211 (2d Cir. 2012).  The Second Circuit concluded that on summary judgment the superintendent's actions were

not objectively unreasonable because it was undisputed that the guidance counselor utilized grievance procedures provided for in a collective bargaining agreement, was provided with notice and a hearing, received a favorable decision restoring her status and awarding backpay and benefits. *Id.* at 220. The Second Circuit explained although the district court identified imperfections in the notice, the notice "conveyed to Coollick enough information to file a grievance. The Notice also gave Coollick an opportunity to respond by inviting her to submit any questions she may have to human resources." *Id.* at 221. The Second Circuit explained that "viewed in the light most favorable to Coollick, Hughes's actions lie somewhere in the gray area in the spectrum of what satisfies due process given the particular facts of this case. Hughes sent Coollick reasonably clear notice well in advance of any deprivation, which allowed Coollick to avail herself of the collective bargaining agreement's grievance procedures." *Id.* As discussed above, the facts of the Board's complaint policy for non-unionized personnel and the Plaintiff's failure to utilize those procedures go beyond the allegations of the complaint and will not be considered at the motion to dismiss stage. At the motion to dismiss stage, the Court's analysis of qualified immunity is limited to the allegations in the complaint which plausibly state that Plaintiff had a protected property interest in his employment and was suspended and then terminated without a hearing. On the basis of those allegations, qualified immunity cannot be established at the motion to dismiss stage. Instead, this is an issue which is best left to be raised in a motion for summary judgment. Whether Tyler's actions were objectively reasonable in light of the Board's

complaint policy for non-unionized personnel is likewise a question best reserved for summary judgment.   At this stage, the Court declines to find that qualified immunity protects Tyler.

      vi.      Covenant of Good Faith and Fair Dealing

      Defendants argue that CFEPA is the exclusive remedy for Plaintiff's claim that Defendants breached the covenant of good faith and fair dealing when he was terminated due to his disability in violation of public policy.  "Superior court cases and district court cases have ... held that neither a wrongful discharge nor a breach of implied covenant claim is available where the plaintiff has adequate statutory remedies through which the alleged public policy violations can be enforced." *Hancock v. Stop & Shop Companies, Inc.*, No.CR9704061S, 1998 WL 951019, at *4 (Conn. Super. Ct. Dec. 29, 1998) (collecting cases).   "To date, it does not appear that Connecticut's appellate courts have fully addressed the issue of whether CFEPA provides [an] exclusive remedy" and "preempts common-law causes of action,"   *Hall-Duncan v. Bruce Museum, Inc.*, No.FSTCV106004998, 2011 WL 590652, at *3 (Conn. Super. Ct., Jan. 24, 2011) (collecting cases).   It appears that superior court judges are split with respect to this issue. *Id.* (citing cases).

      As Plaintiff points out those cases that do find that claims for wrongful discharge or breach of implied covenant are precluded where the plaintiff has adequate statutory remedies evolved from cases where there was an at-will employment relationship.  The Connecticut Supreme Court has explained that

"[a]lthough we endorse the applicability of the good faith and fair dealing principle to employment contracts, its essence is the fulfillment of the reasonable expectations of the parties.  Where employment is clearly terminable at will, a party cannot ordinarily be deemed to lack good faith in exercising this contractual right.   Like other contract provisions, which are enforceable when violative of public policy, the right to discharge at will is subject to the same restriction.  We see no reason presently, therefore, to enlarge the circumstances under which an at will employee may successfully challenge his dismissal beyond the situation where the reason for his discharge involves impropriety ... derived from some important violation of public policy. *Magnan v. Anaconda Indus., Inc.,* 193 Conn. 558, 572 (1984).  Consequently, employees who are terminable at-will can only maintain a claim for breach of the covenant of good faith and fair dealing or wrongful discharge on the basis that their termination was in violation of public policy, unlike an employee who is terminable only for cause.   Because the Plaintiff's employment was not terminable at-will, he is not limited to bringing a claim for breach of the covenant of good faith and fair dealing on the basis of a public policy violation.  However, Plaintiff has chosen to expressly predicate his claim on the basis of such a public policy violation.

The Connecticut Supreme Court has explained in the context of a claim for wrongful discharge that "[a] finding that certain conduct contravenes public policy is not enough by itself to warrant the creation of a contract remedy for wrongful dismissal by an employer.  The cases which have established a tort or contract remedy for employees discharged for reasons violative of public policy

29

have relied upon the fact that in the context of their case the employee was *otherwise without remedy* and that permitting the discharge to go unredressed would leave a valuable social policy to go unvindicated." *Burnham v. Karl & Gelb, P.C.*, 252 Conn. 153, 159-60 (2000).  The Connecticut Supreme Court concluded that where there existed a statutory remedy for that particular public policy violation, the claim for wrongful discharge was "precluded by virtue of the existence of [that] statutory remedy."  *Id.* at 161-62.

Connecticut courts have extended the Supreme Court's logic in *Burnham* to preclude claims for breach of the covenant of good faith and fair dealing where there are adequate statutory remedies through which the alleged public policy violations can be enforced.  *See e.g., Campbell v. Town of Plymouth*, 74 Conn.App. 67, 73-76 (2002) (concluding that Conn. Gen. Stat. §31-51m provides the exclusive remedy and precluded the plaintiff from pleading any alternative, common-law cause of action including breach of covenant of good faith and fair dealing); *Powell v. Greenwald Indus., Inc.*, No.CV095013578, 2010 WL 2383784, at *5 (Conn. Super. Ct. April 29, 2010) (concluding on the basis of the analysis contained in *Burnham* that CFEPA provided the "exclusive remedy for the plaintiff's claim of a breach of the implied covenant of good faith and fair dealing" as the "plaintiff relies exclusively on the public policy embodied in the CFEPA as the basis for this claim, as such, the CFEPA provides the exclusive relief."); *see also Hall-Duncan*, 2011 WL 590652, at *4-5 (striking plaintiff's wrongful discharge claim stemming from alleged age discrimination on the basis that "CFEPA provides the plaintiff's exclusive remedy.).  This Court agrees with the reasoning

of these cases.  Based on an application of the Connecticut Supreme Court's analysis and logic in *Burnham*, the Plaintiff's claim for breach of the covenant of good faith and fair dealing based on violation of public policy embodied in CFEPA must be precluded as Plaintiff has failed to establish that CFEPA does not afford an adequate remedy to address the public policy violation.  As the *Powell* court concluded, because the Plaintiff's implied covenant claim is expressly based on a violation of the public policy embodied in CFEPA, CFEPA provides the exclusive relief.

Plaintiff argues that this line of precedent is not applicable to his case because he was not an at-will employee.  However, Plaintiff fails to explain why this distinction makes a difference.   As discussed above although the Plaintiff was not limited to asserting an implied covenant claim on the basis of a public policy violation as an at-will employee would be, he chose to assert this type of claim. This Court sees no reason why the rationale of these cases would not also apply to his claim where his claim is likewise predicated on the violation of public policy embodied by a statute upon which he asserts a claim and which statute he fails to establish provides an inadequate remedy.   Accordingly, the Court grants Defendants' motion to dismiss Plaintiff's breach of the covenant of good faith and fair dealing claim.

vii.    Punitive Damages

Defendants argue that Plaintiff's claim for punitive damages against the Board should be dismissed.   As the Court has dismissed the Plaintiff's Section

1983 claims against the Board and Tyler in her official capacity, the Court need not address Defendants' arguments regarding punitive damages under federal law.   Defendants argue that under Connecticut state law it is impermissible to award punitive damages against a municipality on public policy grounds.  [Dkt. #32, Mem. p.28].  The Connecticut Appellate court has noted that "[i]n the overwhelming majority of jurisdictions which have considered [whether a municipality is liable for punitive damages], it is now firmly established that exemplary or punitive damages are not recoverable unless expressly authorized by statute or through statutory construction.... In denying punitive or exemplary damages, most courts have reasoned that while the public is benefitted by the exaction of such damages against a malicious, willful or reckless wrongdoer, the benefit does not follow when the public itself is penalized for the acts of its agents over which it is able to exercise but little direct control." *City of Hartford v. Int'l Ass'n of Firefighters, Local 760*, 49 Conn.App. 805, 266 (1998) (internal quotation marks and citations omitted).

The parties have failed to substantively brief whether punitive damages have been authorized by statute or through statutory construction in connection with any of the state law claims at issue.  For example, at least one court has found that an award of punitive damages  against a municipal entity under CFEPA does not violate public policy. See *Jackson v. Hartford Bd. of Educ.*, No.KNLCV095009854S, 2009 WL 7630238, at *2 (Conn. Super. Ct. July 27, 2009).[2]

---

[2] **The Court also notes that Connecticut courts are split on the issue of whether punitive damages are even available for CFEPA violations in an appropriate case.**

It is really premature to determine whether punitive damages are available at this stage in the litigation in view of the inchoate nature of the briefing particularly given the fact that summary judgment could further narrow the claims at issue or result in judgment being entered for the Defendants.  In view of this, the parties may raise the issue of the appropriateness of punitive damages after summary judgment.

<u>Conclusion</u>

Based upon the above reasoning, Defendants' [Dkt. #31] motion to dismiss is DENIED IN PART and GRANTED IN PART.  The Plaintiff's stigma-plus due process, equal protection, implied covenant of good faith and fair dealing claims have been dismissed.   In addition, Plaintiff's due process claim against the Board and Defendant Tyler in her official capacity have also been dismissed and Plaintiff's ADA and Section 504 claims against Defendant Tyler are dismissed.

IT IS SO ORDERED.

_____/s/_____
Hon. Vanessa L. Bryant
United States District Judge

Dated at Hartford, Connecticut: January 9, 2013

See *Kariuki v. Health Resources of Rockville, Inc.*,  No.CV116003960S, 2011 WL 6934695, at *2 (Conn. Super. Ct. Dec. 7, 2011).